## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

KATHLEEN STANCAVAGE,    :
                             :

                Plaintiff    :     **No. 3:14-CV-1215**
                             :

        vs.             :     **(Judge Nealon)**
                             :

CAROLYN W. COLVIN, Acting    :
Commissioner of Social Security,    :
                             :

        Defendant    :

## MEMORANDUM

On June 23, 2014, Plaintiff, Kathleen Stancavage, filed this appeal[1] under

42 U.S.C. § 405 for review of the decision of the Commissioner of Social Security

denying her claim for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 400-403.  (Doc. 1).  The parties have fully

briefed the appeal.  For the reasons set forth below, the decision of the

Commissioner denying Plaintiff's application for DIB will be affirmed.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB on July 9, 2013.  (Tr.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2. Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits.  A protective filing date allows
an individual to have an earlier application date than the date the application is

54).[3]  This claim was initially denied by the Bureau of Disability Determination

("BDD")[4] on August 19, 2013.  (Tr. 54).  On October 21, 2013, Plaintiff filed a

written request for a hearing before an administrative law judge.  (Tr. 54).  A

hearing was held on January 16, 2014 before administrative law judge Timothy

Wing ("ALJ"), at which Plaintiff, witness Carrie Michelle Trent, and vocational

expert, Bill Keenan ("VE"), testified.  (Tr. 99).  On January 29, 2014, the ALJ

issued a decision denying Plaintiff's claims because, as will be explained in more

detail infra, Plaintiff's impairments did not meet or medically equal any

impairment Listing and Plaintiff could perform sedentary work with limitations.

(Tr. 57-63).

On April 4, 2014, Plaintiff filed a request for review with the Appeals

Council.  (Tr. 49).  On May 1, 2014, the Appeals Council concluded that there was

no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).  Thus, the

ALJ's decision stood as the final decision of the Commissioner.

---

actually signed.

3.  References to "(Tr. ___)" are to pages of the administrative record filed by
Defendant as part of the Answer on August 26, 2014.  (Doc. 6).

4.  The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

Plaintiff filed the instant complaint on June 23, 2014.  (Doc. 1).  On August

26, 2014, Defendant filed an Answer and Transcript from the Social Security

Administration ("SSA") proceedings.  (Docs. 5 and 6).  Plaintiff filed the brief in

support of her complaint on October 10, 2014.  (Doc. 7).  Defendant filed a brief

in opposition on November 6, 2014.  (Doc. 8).  Plaintiff did not file a reply brief.

The matter is now ripe for review.

Disability insurance benefits are paid to an individual if that individual is

disabled[5] and insured, that is, the individual has worked long enough and paid

---

5.  To receive disability benefits, the plaintiff must demonstrate an "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

social security taxes.  The last date that a claimant meets the requirements of being

insured is commonly referred to as the date last insured.  It is undisputed that

Plaintiff meets the insured status requirements of the Social Security Act through

December 31, 2011.  (Tr. 56).

Plaintiff was born in the United States on August 17, 1978, and at all times

relevant to this matter was considered a "younger individual"[6] whose age would

not seriously impact her ability to adjust to other work.  20 C.F.R. §§ 404.1563(c);

(Tr. 206).

Plaintiff obtained her masters degree in social work, and can communicate

in English.  (Tr. 109, 209).  Her employment records indicate that she previously

worked as a cashier and dietician, and was a member of the United States Armed

Forces ("ARMY").  (Tr. 211).

The records of the SSA reveal that Plaintiff had earnings in the years 1997

through 2006.  (Tr. 194).  Her annual earnings range from a low of seven thousand

three hundred sixty-six dollars and fifty-eight cents ($7,366.58) in 1997 to a high

---

6. The Social Security regulations state that "[t]he term younger individual is used
to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix
2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we
generally do not consider that your age will seriously affect your ability to adjust
to other work. However, in some circumstances, we consider that persons age 45-
49 are more limited in their ability to adjust to other work than persons who have
not attained age 45.  See Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

4

of nineteen thousand nine hundred thirty-three dollars and ninety-five cents ($19,933.95) in 2004.  (Tr. 194).  Her total earnings during those nine (9) years were one hundred forty-nine thousand seven hundred eighty-five dollars and fifty-three cents ($149,785.53).  (Tr. 194).

Plaintiff's alleged disability onset date is November 1, 2006.  (Tr. 54, 206). The impetus for her claimed disability is a combination of lumbar spine problems and post-traumatic stress disorder ("PTSD").  (Tr. 210).

In a document entitled "Function Report - Adult" filed with the SSA in July of 2013,  Plaintiff indicated that she lived in a house with her brother.  (Tr. 241). From the time she woke up until she went to bed, Plaintiff would take her medicine, look at her calendar to see if she had to go anywhere, check her phone messages, deal with the Veteran's Affairs Department for her doctor appointments, and go to the gym with her brother-in-law three (3) to five (5) times a week.  (Tr. 241).  She indicated that her PTSD made it hard for her to "control her mind," that she was easily confused, that she "checked out" of conversations with people, and that she hated going out in public alone without a "safety person."  (Tr. 241).  She stated that she was slowing starting to go places, but that she would have panic attacks and anxiety that caused nausea when in public.  (Tr. 241).  However, she indicated she recently started going to doctor's appointments and court alone as

5

long as a familiar face was present.  (Tr. 246).  She experienced uneasiness when in crowds.  (Tr. 242).   She "felt best at home with the puppy," which she took care of by feeding it and taking it for walks.  (Tr. 241-242).  She experienced unusual fears of fireworks, fires, gunshots, fueling, helicopters, and planes, and was always "scanning . . . for enemies" when driving.  (Tr. 248).

She had difficulty sleeping due to PTSD as a result of serving in the Army because she would have flashbacks and night tremors.  (Tr. 242).   She indicated that she had no problems with personal care, prepared her own meals three (3) to five (5) times a week for thirty (30) minutes at a time, did her laundry, engaged in light cleaning, and shopped in stores and online about once a month for over thirty (30) minutes.  (Tr. 242-244).  She could pay bills, count change, handle a savings account, and use a checkbook.  (Tr. 244).  When asked to check items that her illness, injuries, or conditions did not affect, Plaintiff did not check talking, hearing, seeing, completing tasks, or using hands.  (Tr. 245).

Regarding her concentration and memory, Plaintiff needed special reminders to take her medicine and perform daily tasks such as taking out the trash, attending appointments, going to the gym, and for "basically everything." (Tr. 242-243).  Her attention span depended on her triggers for PTSD.  (Tr. 245). She stated she followed written instructions "okay," and that she was bad with

6

deadlines and reading small print. (Tr. 245). When asked how she followed

spoken instructions, she responded that she needed to have instructions written or

incorporated into her routine. (Tr. 245). She did not handle changes in routine or

stress well. (Tr. 248).

Socially, Plaintiff left her house two (2) to five (5) days a week with "safety

people" or her puppy, and would walk, drive, or ride in a car when doing so. (Tr.

244). She usually needed to be accompanied by a "safety person," or panic attacks

would occur. (Tr. 244). She liked to be alone, did not enjoy communicating with

others, and found one on one communication to be "less confusing." (Tr. 245).

Since her PTSD began, she felt a "numbness towards others, anxiety, and panic

attacks if [there was] a change in routine or [at] a party/ family gathering [or the]

grocery store." (Tr. 245). She was a volunteer mentor for veterans at

Northumberland County Veterans' Court and helped sometimes volunteered at the

veterans hospice. (Tr. 246). She liked to text others and use Facebook to keep in

touch with "old military friends." (Tr. 246). She attended a PTSD group in York,

Pennsylvania every other Monday. (Tr. 246). In terms of how well she got along

with authority figures, she preferred not to deal with them, and when necessary,

she would be brief with little to no eye contact. (Tr. 248). Regarding medications,

Plaintiff took the following prescribed medications: Seroquel, Darvocet, and

Vicodin.  (Tr. 249).

At her hearing, Plaintiff alleged that the following combination of physical

problems prevented her from being able to work since November of 2006: (1)

PTSD; (2) post lumbar anterior fusion back pain; (3) leg pain; (4) bilateral knee

pain; and (5) foot pain.  (Tr. 103).  Plaintiff injured both knees while on active

duty in Afghanistan from 2002 to 2003.  (Tr. 116-117).  The back injury occurred

when she was loading supplies onto a truck while on active duty in Iraq.  (Tr.

116).  Her back injury consisted of a pilonida cyst that required surgery to drain it.

(Tr. 116).  She was then on bed rest for a few weeks, and re-injured her back when

was unloading a truck.  (Tr. 116).  Upon returning home from her tour, she

returned to school at Bloomsburg University, and received her undergraduate

degree in social work at the end of 2009.  (Tr. 119).  During her time at

Bloomsburg University, she participated in two (2) internships part-time, with one

(1) internship requiring her presence one (1) day a week and the other internship

requiring her presence three (3) times a week.  (Tr. 119).  Her job during these

unpaid internships was to go to the houses of elderly people when they fell to reset

a button that they would use to call for help when a fall occurred, and she would

also help with record-keeping.  (Tr. 128).  She stated that after a few weeks of her

internship, she became friends with the people at work.  (Tr. 128).  She testified

8

that she would do as much school work as she could to "avoid what was going on

in [her] head." (Tr. 120). When the topic of war was brought up in class, she

would have to excuse herself from the classroom, especially when the topic of

PTSD arose. (Tr. 121). She did not feel comfortable participating in groups larger

than five (5) people, and would feel uncomfortable in the library, where she would

sit in a corner while she studied so she could look at the door to see who was

coming. (Tr. 129). She scheduled her back surgeries during breaks, and was on

the Dean's List her first semester. (Tr. 121-122). However, her grades went

"downhill" after that, with her average grades being a "B" or above. (Tr. 122).

Plaintiff then obtained her masters degree in social work, attending class

full-time and driving to Scranton approximately two (2) times a week from her

Mount Carmel home and to the campus at "Life Geisinger" three (3) times a week.

(Tr. 109-110). Plaintiff had back surgery, and then attempted to complete an

internship, but ended up in the emergency room ("ER") usually every other

weekend because the full-day workweek of her internship caused her severe back

pain that radiated to her legs. (Tr. 110-111). Because she was in school, she

refused narcotic pain medication, and instead took Tylenol 3 for her pain. (Tr.

111). Her masters classes required her to give presentations and participate in

research projects. (Tr. 113). She testified that she fell three (3) times between

9

December and January despite using a cane, and had to use knee braces for walking around on campus to attend class. (Tr. 113). She stated that, in the summer of 2010, the school she attended gave her a handicapped parking permit. (Tr. 114).

Since November of 2006, when Plaintiff was discharged from the military, she had received disability payments, and collected unemployment from 2006 to 2007, but had no other income. (Tr. 118, 123). She testified that in order to obtain unemployment compensation, she had to testify that she was ready and able to work. (Tr. 123). She stated that large crowds and stores, her fear of going out alone, and her back and knee pain kept her from pursuing any full-time job since her discharge on November 1, 2006. (Tr. 124).

She testified that her physical limitations included being unable to bend over to pick something up from the floor or tie her shoes and difficulty walking. (Tr. 125-126). She had no problems driving with the exception of when she had her spine surgery, and that she would commute with others such as her cousin or close friend. (Tr. 127). From her house to Bloomsburg, it was approximately a forty (40) to forty-five (45) minute commute. (Tr. 127).

Plaintiff also testified about her PTSD. (Tr. 132). Her triggers included tasks such as vacuuming her car, which gave her flashbacks to when she was

serving in Iraq and cleaning up blood and body parts.  (Tr. 132).  She had dreams

in which she would die in aircraft, and explained that she had sleep problems due

to events that happened while she was on tour in Iraq, such as being shot at and

having to help a little girl injured in a "stool bombing."  (Tr. 133).  She stated that

her PTSD has worsened since her discharge from the military.  (Tr. 135).  She

tended to drift off during conversations with others and would think about herself

doing her job refilling airplanes and helicopters with gas while the engines were

running.  (Tr. 138).  She saw a psychiatrist, but stated that she gave him very

minimal information regarding her symptoms because she was in school and

"didn't . . . want to focus on [her] problems at that time."  (Tr. 136).  Eventually,

she started seeing a psychiatrist weekly, but when he became sick and suggested

she attend a thirty (30) day camp for people with PTSD, she decided not to go, and

stopped going to counseling altogether.  (Tr. 136).  Later, she found a PTSD group

for women in York, Pennsylvania, and joined that the summer before her hearing.

(Tr. 136).

At the time of her hearing, Plaintiff was taking the following medications:

Tylenol 3, Cyclobenzaprine, Loratadine, Meloxicam, Ranitidine, Methyl

Salicylate, Simvastin, Terbinafine, and Tramadol.  (Tr. 131-132).  She used a tens

unit and heating and ice pads on her knees and lower back for pain relief.  (Tr.

132). She was attending physical therapy at the time of the oral hearing for her lower spinal damage, and her therapy consisted of pool therapy. (Tr. 132).

At the time of her hearing, she testified that she was able to lightly dust and vacuum, but that she could no longer walk her dog due to increased back and leg pain. (Tr. 138-139).

## MEDICAL RECORDS

Before the Court addresses the ALJ's decision and the arguments of counsel, Plaintiff's relevant mental health medical records will be reviewed in detail, beginning with records from his alleged disability onset date of November 6, 2006 through the date of last insured of December 31, 2011.

On February 12, 2007, Plaintiff underwent a screening for multiple physical and mental impairments, one of which was a PTSD screening. (Tr. 1030). Plaintiff answered "yes" to three (3) of the PTSD questions, and this score meant that Plaintiff was positive for PTSD. (Tr. 1032).

On March 5, 2007, Plaintiff had a forty-five (45) minute psychological evaluation for PTSD with Dr. Helene Chaplan. (Tr. 1025). Plaintiff's eye contact and demeanor were appropriate, the rate and volume of her speech were within normal limits, her mood was neutral, her affect was appropriate to content, and there was no evidence of thought disorder or perceptual disturbance. (Tr. 1025).

12

Dr. Chaplan opined that Plaintiff met criterion A through F of PTSD, and stated that she would benefit from outpatient psychotherapy and/ or participating in a PTSD group.  (Tr. 1025-1026).

On March 28, 2007, Plaintiff had a "Compensation and Pension Examination" that was conducted by Dr. James Beshai   (Tr. 999).  In the "Medical History/ Subjective Complaint" section, it was noted that Plaintiff's complaints to Dr. Biney gave a clinical impression of PTSD.  (Tr. 1000).  It was noted that Plaintiff's insomnia started in 2005 as a result of the loss of her close friend who was burned in a "friendly fire" before she completed her Afghanistan tour.  (Tr. 1000).  Plaintiff also experienced nightmares of the war and daytime hypersomnolence.  (Tr. 1000).  It was noted that Plaintiff's eye contact was good, her affect was within normal limits with no anger outbursts, she was alert, pleasant, and coherent, and her mood was neutral with signs of being dysthymic. (Tr. 1002).  In the "Assessment of [PTSD]" section, Plaintiff indicated that she was placed in a stressful job as a fuel truck driver for the military, that her convoy was frequently shot at, that her base was often shelled at night, that her trailer was a constant target, and that she helped clean body parts and blood for the wounded. (Tr. 1001).  Dr. Beshai concluded that these military stressors were more likely than not to precipitate PTSD symptoms with panic attacks, which meant Plaintiff

13

met criterion A for PTSD.  Dr. Beshai opined that Plaintiff met criterion B for

PTSD because she continued to experience frequent sleep problems with intrusive

thoughts and nightmares that were centered around the smell of fuel and sounds of

sirens and low flying helicopters.  (Tr. 1001).  Plaintiff also met criterion C of

PTSD because she was withdrawn from family and friends, was afraid to sleep at

night, and was unable to relate to civilians.  (Tr. 1001).  Dr. Beshai opined that

Plaintiff met criterion D of PTSD because Plaintiff has a poor sleep pattern of only

three (3) hours a night with frequent wakefulness, felt panicky, was "worn out"

with a pale appearance, lost trust in people she used to trust, had no close friends,

and had no drive to socialize.  (Tr. 1001).  Plaintiff met criterion E of PTSD

because she had been experiencing her symptoms for over six (6) months, and she

met criterion F of PTSD because her symptoms caused clinically significant

distress and social and occupational impairment.  (Tr. 1002).  Ultimately, Dr.

Beshai diagnosed Plaintiff with severe PTSD, and gave Plaintiff a Global

Assessment Functioning Score ("GAF")[7] of forty-nine (49).  (Tr. 1002-1003).

---

7.  The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment
of a person's overall psychological, social and occupational functioning, in order
to assess the person's mental health illness.  American Psychiatric Association
(2000).  Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.).
Washington, DC: Author.  A GAF score is set within a particular range if either
the symptom severity or the level of functioning falls within that range.  Id.  The
score is useful in planning treatment and predicting outcomes.  Id.  The GAF

On February 6, 2008, Plaintiff had a "Compensation and Pension

Examination." (Tr. 939). During this exam, it was noted that Plaintiff had been

diagnosed with PTSD. (Tr. 939). It described the combat situations Plaintiff

encountered in Afghanistan and Iraq, including blasts, mortar fire, and clean-ups

---

rating is the single value that best reflects the individual's overall functioning at
the time of examination. The rating, however, has two components: (1) symptom
severity and (2) social and occupational functioning. The GAF is within a
particular range if either the symptom severity or the social and occupational level
of functioning falls within that range. When the individual's symptom severity
and functioning level are discordant, the GAF rating reflects the worse of the two.
Thus, a suicidal patient who is gainfully employed would have a GAF rating
below 20. A GAF score of 21-30 represents behavior considerably influenced by
delusions or hallucinations or serious impairment in communication or judgment
or inability to function in almost all areas. Id. A GAF score of 31-40 represents
some impairment in reality testing or communication or major impairment in
several areas, such as work or school, family relations, judgment, thinking or
mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious
impairment in social, occupational or school functioning. Id. A GAF score of 51
to 60 represents moderate symptoms or any moderate difficulty in social,
occupational, or school functioning. Id. A GAF score of 61-70 indicates some
mild symptoms or some difficulty in social, occupational, or school functioning.
Id. Recently, the American Psychiatric Association no longer uses the GAF score
for assessment of mental disorders due to concerns about subjectivity in
application and a lack of clarity in the symptoms to be analyzed. Solock v. Astrue,
2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014) (citing Ladd v.
Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16, 2014)); See Am.
Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 5d, 16
(2013). As a result, the SSA permits ALJs to use the GAF score as opinion
evidence when analyzing disability claims involving mental disorders; however, a
"GAF score is never dispositive of impairment severity," and the ALJ, therefore,
should not "give controlling weight to a GAF from a treating source unless it is
well[-]supported and not inconsistent with other evidence." SSA AM-13066 at 5
(July 13, 2013).

of vehicles with body parts, that caused anxiety and stress. (Tr. 939-940). It was noted that her past psychiatric history was negative for inpatient treatment, positive for some counseling, and positive for psychotropic medications in the past, but not at that present time. (Tr. 940). In the subjective complaints section, Plaintiff indicated that she struggled with post-traumatic stress problems due to several stressors. (Tr. 941). She recalled having disturbing nightmares a couple times per week, and had feelings of anxiety, distress, and depression when she had thoughts about them. (Tr. 941). She experienced sleep difficulties, hypervigilance, uneasiness, jumpiness, and discomfort. (Tr. 941). She did not like to talk about her experiences that occurred while on active duty as it caused her to become very angry, irritable, and anxious when thinking about it. (Tr. 941). She reported feeling detached, felt distant to people in school, and avoided going to ceremonies about the war and to bars where the war was a topic of subject because it brought back bad memories. (Tr. 941). Plaintiff's exam revealed good eye contact, normal speech, a euthymic mood, broad-ranged affect, and a clear, coherent, goal-directed and logical thought process. (Tr. 942). Her thought content was free of any obsessions, compulsions, delusions, or hallucinations, and Plaintiff was alert and oriented with no evidence of any major concentration or memory disturbances. (Tr. 942). Judgment and insight were "pretty good." (Tr.

16

942).  Her Axis I diagnosis was PTSD, and her GAF was a sixty-five (65) to a

seventy (70).  (Tr. 942).  Plaintiff was encouraged to continue treatment, and it

was stated that she seemed to be doing "fairly well" with only mild PTSD with an

expectation of spontaneous resolution of symptoms.  (Tr. 942).

On July 7, 2008, Plaintiff had a forty-five (45) minute cognitive behavioral

therapy session with Dr. Holly Kricher for treatment of her PTSD.  (Tr. 909).

Plaintiff's mood was euthymic and her affect was bright.  (Tr. 909).  Plaintiff

stated she was not having any problems at that time aside from difficulty sleeping

since her return from Iraq.  (Tr. 909).  Plaintiff's diagnosis was PTSD, and she was

scheduled for a follow-up appointment in three (3) months.  (Tr. 910).

On October 10, 2008, Plaintiff had a psychotherapy appointment with Dr.

Thomas Roedema for her PTSD.  (Tr. 881).  Plaintiff stated that the only reason

she went to that appointment was because her vocational rehabilitation counselor

recommended that she attend once every four (4) months to monitor symptoms.

(Tr. 882).  Dr. Roedema stated that he would re-evaluate whether she continued to

meet the criteria for PTSD.  (Tr. 881).  Plaintiff stated that overall she was

functioning well, did not present any issues to work on in therapy, and did not

describe significant distress or impairment in functioning.  (Tr. 882).  Plaintiff

indicated that she did not have any nightmares, as she only slept for four (4) hours

during the afternoon which she reported to be an adequate amount.  (Tr. 882).

Plaintiff reported that things did remind her of traumatic events, but that she

would "disengage from the situation and [felt] she [was] coping well with these

occurrences."  (Tr. 882).  She attended class three (3) days per week, and usually

had appointments on the other days.  (Tr. 882).  She would spend time watching

her nephew at her sister's house, and would then do homework.  (Tr. 882).  It was

indicated that she got along well with "everyone."  (Tr. 882).  Plaintiff showed no

signs of disturbances of thought processes or content or perceptual disturbances,

her expressive and receptive communication was intact, her mood was stable and

euthymic, and her affect was euthymic.  (Tr. 882).  The treatment plan was to

follow through with Dr. Roedema's recommendations, monitor for changes in

symptoms, and reassess relevance to overall problems.  (Tr. 882).

On January 21, 2009, Plaintiff had an outpatient psychotherapy appointment

with Dr. Roedema.  (Tr. 848).  It was noted that Plaintiff appeared to be coping

with her PTSD symptoms, mostly through avoidance, and "ha[d] been able to

function relatively well as a result."  (Tr. 849).  She reported that she went grocery

shopping a few times a month with her sister, and out to dinner "once in a blue

moon" with her brother.  (Tr. 849).  She continued to have symptoms of PTSD, but

it was noted at this appointment that while she continued to meet criteria B and C

18

for the PTSD diagnosis, she did not meet criteria D.  (Tr. 849).  She was not

generally depressed or nervous, and had not had any panic attacks.  (Tr. 849).  She

noted that her PTSD symptoms were activated by sirens and helicopters, and that

she "fought off" flashbacks at Christmas time when a helicopter was circling the

area around her house at night.  (Tr. 849).  She indicated that she had "visions"

when the war was discussed in class, with the longest duration of such a vision

being five (5) minutes, which was the length of time of the conversation about

war, before she removed herself from the classroom.  (Tr. 849).  She stated that

this occurred about once a month in class.  (Tr. 849).  Contact from her old

military friends caused her to have nightmares and experience sleep disturbances

for up to a week.  (Tr. 849).  She slept every day from four (4) o'clock in the

afternoon to eight (8) o'clock in the evening because her schedule never adjusted

after she returned from Iraq.  (Tr. 849).  Plaintiff showed no signs of disturbances

of thought processes or content or perceptual disturbances, her expressive and

receptive communication was intact, and her mood and affect were within normal

limits with some anxiety and restricted range.  (Tr. 849).  Plaintiff was scheduled

to return to the clinic for psychotherapy in six (6) months.  (Tr. 849).

On July 8, 2009, Plaintiff had an outpatient psychotherapy appointment with

Dr. Roedema.  (Tr. 813).  Plaintiff had been experiencing an increase in her PTSD

symptoms due to fireworks and contact with "old military buddies."  (Tr. 814).

Plaintiff showed no signs of disturbances of thought processes or content or

perceptual disturbances, her expressive and receptive communication was intact,

her mood was stable, and her affect was within normal limits.  (Tr. 814).   Dr.

Roedema reiterated to her the possibility of starting therapy through the "PCT"

program, but Plaintiff's schedule and distance were hindrances.  (Tr. 814).

Plaintiff was scheduled to return to the clinic for psychotherapy in six (6) months.

(Tr. 814).

On January 8, 2010, Plaintiff had an outpatient psychiatry appointment with

Dr. Roedema.  (Tr. 730).  Plaintiff noted an increase in her PTSD symptoms

recently that related to "an increase in free time that accompanied her graduation

from college." (Tr. 731).  Plaintiff showed no signs of disturbances of thought

processes or content or perceptual disturbances, her expressive and receptive

communication was intact, her mood was anxious and stressed due to pain, and her

affect was within normal limits.  (Tr. 732).   Plaintiff had been using breathing and

relaxation techniques to manage her symptoms.  (Tr. 732).  Her Axis I diagnosis

was PTSD.  (Tr. 730).  Her strengths included an ability to establish and maintain

relationships, cooperation, good social and verbal skills, a good work history, and

an intact support system.  (Tr. 730).  Her goals were to reduce her PTSD

symptoms by improving sleep, decreasing hypervigilence, decreasing nightmares, decreasing flashbacks, and improving social interactions.  (Tr. 731).  She was scheduled to return to the clinic for psychotherapy in six (6) months.  (Tr. 732).

On July 8, 2010, Plaintiff had an appointment with Dr. Roedema for a fifty (50) minute outpatient psychotherapy session in reference to her PTSD.  (Tr. 694). Interventions used included cognitive behavioral therapy and supportive techniques.  (Tr. 694).  Plaintiff noted an increase in her PTSD symptoms in March and April due to contact from someone who had been in her unit.  (Tr. 694).  It was noted that the "imagery rehearsal worked well for the dream related to a little girl."  (Tr. 695).  Plaintiff showed no signs of disturbances of thought processes or content or perceptual disturbances, her expressive and receptive communication was intact, her mood was stressed due to pain, and her affect was within normal limits.  (Tr. 695).  The treatment plan was to monitor changes in symptoms and reassess relevance to overall problems.  (Tr. 695).

On December 28, 2010, Plaintiff had an appointment with Dr. Roedema for a fifty (50) minutes outpatient psychotherapy session for her PTSD.  (Tr. 655).  It was noted that Plaintiff had been "handling things" well, including school, her internship, the holidays, and seeing friends and relatives.  (Tr. 655).  She reported that she did not feel depressed, and did not complain of re-experiencing, avoiding,

or arousal symptoms.  (Tr. 656).  Plaintiff showed no signs of disturbances of

thought processes or content or perceptual disturbances, her expressive and

receptive communication was intact, her mood was stable, and her affect was

within normal limits.  (Tr. 656).  It was stated, "Given her status, the length of her

drive to make these appointments, and the limited efficacy of psychotherapy once

every 6 months, we agreed not to reschedule at this time . . ."  (Tr. 656).

On March 21, 2011, Plaintiff had a psychotherapy session with Dr.

Roedema for PTSD.  (Tr. 632).  It was noted that Plaintiff showed no signs of

disturbances of thought processes or content or of perceptual disturbances.  (Tr.

632).  Plaintiff's expressive and receptive communication were intact, her mood

was "angry and worried," and her affect showed restricted range with hinted

anger.  (Tr. 632).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity

("RFC") to return to his or her past work and (5) if not, whether he or she can

perform other work in the national economy.  See 20 C.F.R. § 404.1520; Poulos,

474 F.3d at 91-92.

As part of step four, the Commissioner must determine the claimant's RFC.

Id.  If the claimant has the RFC to do his or her past relevant work, the claimant is

not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps

one through four."  Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d

546, 550 (3d Cir. 2004).  RFC is the individual's maximum remaining ability to do

sustained work activities in an ordinary work setting on a regular and continuing

basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A

regular and continuing basis contemplates full-time employment and is defined as

eight hours a day, five days per week or other similar schedule.  The RFC

assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R.

§§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'[RFC]' is defined as

that which an individual is still able to do despite the limitations caused by his or

her impairment(s).").

"At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and [RFC]. "  See 20 C.F.R. §

404.1520; Poulos, 474 F.3d at 91-92.

## ALJ DECISION

Initially, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. (Tr. 56). The ALJ then proceeded through each step of the sequential evaluation process and determined that Plaintiff was not disabled. (Tr. 56).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of November 6, 2006. (Tr. 56).

At step two, the ALJ determined that Plaintiff suffered from the severe[8] combination of impairments of the following: "lumbar degenerative disc disease status-post surgery, degenerative joint disease of right knee, bilateral patellofemoral syndrome, and post-traumatic stress disorder (PTSD) (20 C.F.R. 404.1520(c))." (Tr. 56).

At step three of the sequential evaluation process, the ALJ found that

---

8. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  (Tr. 57).

At step four, the ALJ determined that Plaintiff had the RFC to perform a full

range of sedentary work with limitations.  (Tr. 60-63).  Specifically, the ALJ stated

the following:

> After careful consideration of the entire record, I find that,
> through the date last insured, [Plaintiff] had the [RFC] to
> perform sedentary work as defined in 20 CFR 404.1567(a).
> [Plaintiff] is limited to occupations that require no more than
> occasional postural maneuvers, such as balancing, stooping,
> crouching, and climbing on ramps and stairs; must avoid
> occupations that require climbing on ladders, kneeling, or
> crawling; must be afforded the option to sit and stand during
> the work day for brief periods of 1-2 minutes every thirty
> minutes or so; [is] further limited to no more than occasional
> pushing and pulling with the upper and lower extremities and is
> limited to occupations which do not require exposure to
> dangerous machinery and unprotected heights.  Finally,
> [Plaintiff] is limited to no more than occasional interaction with
> supervisors, co-workers, and members of the general public.

(Tr. 60).

At step five of the sequential evaluation process, considering the Plaintiff's

age, education, work experience, and RFC, the ALJ determined "there are jobs that

exist in significant numbers in the national economy that the [Plaintiff] can

perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))."  (Tr. 64).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between the alleged onset date of November 6, 2006, through the date last insured, December 31, 2011.  (Tr. 65).

## DISCUSSION

In her complaint and brief in support, Plaintiff is alleging that: (1) the ALJ erred in not finding that Plaintiff met Listing 12.06, Anxiety Related Disorders, as a result of PTSD; and (2) the ALJ failed to give an adequate reason when rejecting treating and examining source opinions and failed to give proper consideration to treating and examining sources pursuant to 20 C.F.R. §§ 416.927 and 404.1527(d) and Social Security Rulings 96-2p and 96-5p.  (Doc. 7, pp. 2-10).  Defendant disputes these contentions.  (Doc. 8, pp. 17-25).

### 1.    Listing 12.06 and Post-traumatic Stress Disorder

Plaintiff contends that the ALJ erroneously concluded that her PTSD did not meet the requirements of Listing 12.06, Anxiety Related Disorders, based on the psychiatric evaluations and treatment she received from January of 2007 through November of 2013 for PTSD, because she met all criterion for PTSD, and because her symptoms as discussed indicate that she met the Listing requirements for Listing 12.06.  (Doc. 7, pp. 2-10).

Initially, in consideration of this argument, this Court will be considering

only the medical evidence up to the date of last insured, which was December 31, 2011, because the period of disability at issue is from Plaintiff's alleged onset date of November 6, 2006 through the date last insured, and a worsened condition or a new impairment arising after the date last insured cannot be a basis for an award of disability benefits.  See Matullo v. Bowen, 926 F.2d 240, 245-46 (3d cir. 1990) (evidence relating to treatment after date last insured is not relevant to the question of whether the claimant has established that she was under disability prior to the expiration of her date last insured).

A claimant bears the burden of showing that her impairment meets or equals a listed impairment, and that she is thus presumptively disabled.  Burnett v. Comm. of Soc. Sec., 220 F.3d 112, 120 n.2 (citing Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)).   A plaintiff must meet all of the specified requirements of a Listing in order to be considered presumptively disabled. Sullivan v. Zebley, 493 U.S. 521, 532 (1990); 20 C.F.R. § 404.1525(a); 20 C.F.R. pt. 404, subpt. P, app. 1.  A claimant meets Listing 12.06 when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied. Listing 12.06 provides as follows:

> A. Medically documented findings of at least one of the
> following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

    a. Motor tension; or

    b. Autonomic hyperactivity; or

    c. Apprehensive expectation; or

    d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living;

or

2. Marked difficulties in maintaining social
functioning; or

3. Marked difficulties in maintaining
concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of
extended duration.

OR

C. Resulting in complete inability to function independently
outside the area of one's home.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.06.

Under the B criteria of Listing 12.06, the ALJ determined that Plaintiff had

no restrictions in activities of daily living because she could prepare meals, drive,

shop, tend to her personal care, and attend school full time. (Tr. 58). The ALJ

determined that Plaintiff had moderate difficulties in social functioning because

she had difficulty being around people and crowds, but was able to get along well

with her family, attend a PTSD group in York, attend school full-time with about

thirty (30) other students, participate in group presentations, and shop in stores.

(Tr. 58). The ALJ determined that Plaintiff had no difficulties with concentration,

persistence, or pace because she attended school full-time, drove forty-five (45)

minutes to and from full-time school, and studied two (2) hours per night and on

the weekends.  (Tr. 59).  Lastly, the ALJ determined that Plaintiff did not have

repeated episodes of decompensation, each of extended duration, because the

record was "devoid of evidence of episodes of decompensation."  (Tr. 59).  Thus,

the ALJ determined that Plaintiff did not meet criteria B for Listing 12.06.  The

ALJ then determined that Plaintiff's impairments did not meet the C criteria of the

Listing because she had not demonstrated a complete inability to function

independently outside the home.  (Tr. 59).

Upon review of the record, it is determined that the ALJ properly analyzed

Plaintiff's PTSD in relation to the requirements of Listing 12.06, and rendered an

opinion that is supported by substantial evidence that Plaintiff's PTSD did not

meet the requirements of Listing 12.06.  As discussed by the ALJ, Plaintiff was

able to prepare meals, drive to and from school and other appointments without

assistance, shop in stores, attend school full-time, maintain good grades, and

participate in an school group projects and discussions, internships, and support

groups.  (Tr. 58-60).  Thus, the ALJ's determination that Plaintiff's PTSD did not

meet the requirements of Listing 12.06 will not be disturbed on appeal.

Furthermore, because Plaintiff failed to support her second contention

asserted in her brief in support, which was that the ALJ erred in his RFC

determination, this argument has been waived and is not proper for consideration

33

by this Court.  See Harris v. Dow Chemical Co., 2014 WL 4801275 (3d Cir. Sept. 29, 2014) (holding that an argument is waived and abandoned if briefly mentioned in the summary of the argument, but not otherwise briefed); Laborers' Int'l Union of N. America, AFL-CIO v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it . . . and . . . 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'") (citing Frey v. Grubine's RV, 2010 WL 4718750, at *8 (M.D. Pa. Nov. 15, 2010)); Karchnak v. Swatara Twp., 2009 WL 2139280, at *21 (M.D. Pa. July 10, 2009) ("A party waives an issues if it fails to brief it in its opening brief; the same is true for a party who merely makes a passing reference to an issue without elaboration.") (citing Gorum v. Sessions, 561 F.3d 179, 185 n.4 (3d Cir. 2009)).  As such, because Plaintiff has failed to brief the assertion that the ALJ erred in his RFC determination, but rather only made a passing reference to this assertion in the opening of her brief, Plaintiff has waived this assertion.[9]

**CONCLUSION**

The Court's review of the administrative record reveals that the decision of

---

9.  Similarly, Plaintiff makes a passing reference that the ALJ erred in not finding that Plaintiff's physical impairments met the requisite Listings.  However, Plaintiff failed to brief this argument, and, in accordance with the aforementioned case law, this argument is thus deemed as waived.

the Commissioner is supported by substantial evidence.  Therefore, pursuant to 42

U.S.C. § 405(g), Plaintiff's appeal will be denied, and the decision of the

Commissioner denying disability insurance benefits will be affirmed.

A separate Order will be issued.

**Date**: June 1, 2015

**/s/ William J. Nealon**
**United States District Judge**